# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OKLAHOMA

IN RE:                              )
                                    )
SURGICAL ASSOCIATES, INC.,          )       Case No. 13-10081-R
                                    )       Chapter 11
        Debtor in Possession.       )

## ORDER DENYING MOTION TO DISMISS OR ABSTAIN

Before the Court is the Motion to Dismiss Case, or in the Alternative, Motion to Dismiss/Abstain with Supporting Brief (Doc. 28) ("Motion") filed by creditors Judy C. and Doyle Williams (collectively "Williams") on January 22, 2013, and the Response of Debtor in Opposition to Motion to Dismiss Case, or in the Alternative, Motion to Dismiss/Abstain With Supporting Brief (Doc. 64) ("Response") filed by the Debtor in Possession Surgical Associates, Inc. ("Debtor") on February 12, 2013.  A hearing on the Motion was originally set for February 13, 2013 (Doc. 32), which was within the 30 days of the filing of the Motion as mandated by 11 U.S.C. § 1112(b)(3).[1]  Upon the request and consent of movants, the hearing was continued to, and was held on, March 6, 2013 (Docs. 54, 56).

Upon consideration of the testimony and documentary evidence admitted at the hearing, the arguments of counsel, the record in this Chapter 11 case, and applicable law, the Court finds and concludes as follows:

The Court has jurisdiction of this contested matter pursuant to 28 U.S.C. § 1334, §§ 157(a) and (b)(1), and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

---

[1]Unless otherwise indicated, all statutory references made herein are to sections of Title 11 of the United States Code.

**Contentions of the parties**

Williams obtained a judgment against Debtor, an entity owned by eleven general surgeons, after a jury trial of a medical negligence claim.  The judgment has been appealed by Debtor.  In the Motion, Williams asserts that Debtor's Chapter 11 case should be dismissed for cause under § 1112(b) because Debtor filed the case in order to stay Williams's post-judgment collection efforts pending appeal without posting a supersedeas bond. Williams argues that Debtor commenced this bankruptcy case as a litigation tactic to elude the bond requirement rather than as an honest attempt to reorganize its financial affairs. Williams also argues that cause exists to dismiss the case under § 305(a).

Debtor asserts that it was unable to obtain a supersedeas bond despite good faith efforts to do so; that garnishments served by Williams on financial institutions and insurance companies effectively froze Debtor's cash and receivables, making it impossible to continue operating its business; and that filing for relief under Chapter 11 was "the only means available to preserve the Debtor's business and to allow the Debtor to continue to serve its patients."[2]  Accordingly, Debtor maintains that its Chapter 11 petition was filed in good faith for legitimate business and bankruptcy purposes.

**Findings of fact**

Debtor, organized in 1965, operates the largest general surgery practice in the State of Oklahoma, employing 12 surgeons and 25 full-time and 2 part-time support staff. Debtor's surgeons see more than 35,000 patients annually and perform more than 10,000 surgeries per year at a number of Tulsa-area hospitals.  Most of the surgeries are performed

_____

[2]Response at 4.

at Saint Francis Hospital in Tulsa, and Saint Francis Hospital also contracts with Debtor's surgeons to provide trauma surgery services.

In 2008, Williams filed a lawsuit against Debtor and one of its surgeons in the District Court of Tulsa County ("District Court"), alleging injuries arising from medical negligence.[3] On October 24, 2012, a jury awarded Williams a verdict totaling $7.5 million.[4]  On November 8, 2012, the District Court entered a judgment against Debtor in an amount in excess of $8.4 million (the "Judgment").[5]  On November 19, 2012, Debtor moved for a new trial, which had the effect of extending the deadline to appeal the Judgment.[6]  Filing the motion for new trial did not stay enforcement of the Judgment, however.  Williams had agreed to give Debtor notice of an intention to execute seven days prior to taking any action. Williams gave such notice on November 19, 2012, and thus, execution was imminent on or after November 27, 2012.[7]

 On November 26, 2012, in order to avoid the disruption of the surgical practice that would likely occur if Williams began executing on the Judgment, Debtor filed a motion requesting that the District Court exercise its discretion under 12 O.S. § 990.4(B)(1)(b) to

---

[3]Petition, Williams Exhibit 2.

[4]Journal Entry of Judgment, Williams Exhibit 5.  Mrs. Williams was awarded $5 million and Mr. Williams was awarded $2.5 million.

[5]Id.  Prejudment interest in excess of $900,000.00 was added to the jury verdict.

[6]Defendants' Motion for New Trial and Brief in Support, Williams Exhibit 6.

[7]Defendants' Motion to Allow a Lower Supersedeas Bond and Brief in Support, Williams Exhibit 7, at 170.  Note: Because the pages of the entire Williams Exhibit Binder are numbered sequentially, the Court's pinpoint citations herein refer to the page number of the Exhibit Binder, and not the page number of the referenced document or exhibit.

reduce the statutory amount of a supersedeas bond (*i.e.*, approximately $9 million) to $1.25 million, the amount posted by Debtor's malpractice insurer.[8]  Debtor also consented to the entry of an order enjoining it from dissipating or transferring assets outside the normal course of business during the pendency of the motion for new trial and any appeal.[9]

In order for Debtor to establish that it lacked sufficient unencumbered assets to collateralize a bond to secure the uninsured portion of the Judgment (approximately $7.4 million) or to buy Treasuries in lieu of a bond, Debtor supplied to Williams and the District Court documents representing its financial condition.[10]  In drafts of a bankruptcy petition and schedules,[11] Debtor set forth its assets and liabilities, which reflected that as of November 2012, Debtor had assets valued at $776,203.26, secured claims of $297,104.16, and unsecured claims of $7,616,422.20.[12]  These schedules had also been provided to Williams prior to an unsuccessful mediation that was held on November 15, 2012.

In addition to the motion to reduce bond, Debtor filed a motion seeking a discretionary stay, citing again Debtor's inability to post bond, Williams's statement of intent to execute

---

[8]Id. at 115-34.  See also Defendants' Undertaking and Supersedeas Bond, Williams Exhibit 7, at 195-97.

[9]Defendants' Motion to Allow a Lower Supersedeas Bond and Brief in Support, Williams Exhibit 7, at 120.

[10]Id. at 169.

[11]Id. at 172-94.  In late October 2012, following the jury verdict, Debtor's board of directors authorized its executive committee to file a Chapter 11 bankruptcy on behalf of Debtor.  See Williams Exhibit 23.

[12]The list of unsecured claims did not include the almost $1 million awarded to Williams in prejudgment interest and costs.

on or after November 27, 2012, and the inevitability of a bankruptcy filing if Williams proceeded with execution.[13]

On December 4, 2012, the District Court held a hearing on the motion for discretionary stay and the motion to reduce the amount of the bond, after which it entered a temporary stay of execution through January 7, 2013.[14]   In the meantime, Debtor was directed to produce to Williams and the District Court five years of income tax returns and financial statements, and all documents related to its attempts to obtain a supersedeas bond.[15]

On December 20, 2012, Debtor reported that it had, through its attorneys, contacted two insurance companies in an attempt to obtain a supersedeas bond, neither of whom would contract directly with Debtor.[16]   Debtor also had contacted one insurance broker who declined to assist Debtor in obtaining a bond.[17]   A second broker did assist Debtor by requesting bids from various surety companies.  Three companies responded, and each would have required the bond to be fully collateralized, either in cash or with an irrevocable letter

---

[13]Defendants' Motion for Discretionary Stay of Enforcement of Journal Entry of Judgment, Brief in Support, and Application for Expedited Consideration, Williams Exhibit 9, at 200-06.

[14]Order Granting Temporary Stay of Execution, Williams Exhibit 10, at 207-08.

[15]Id. at 208.

[16]Supplemental Brief in Support of Defendant's Motion to Allow a Lower Supersedeas Bond and Brief in Support, Williams Exhibit 13, at 220-21.

[17]Id.

of credit, neither of which Debtor could obtain.[18]  Triad Bank, with whom Debtor had a

$450,000.00 line of credit, declined to extend further credit to secure a bond.[19]

On January 11, 2013, the District Court summarily denied Debtor's motion for new

trial.[20]  Also on January 11, 2013, the District Court dissolved the temporary stay, denied

Debtor's application for discretionary stay, and set the supersedeas bond in the amount of

$9 million, of which Debtor was to post a total of $2.75 million (including the $1.25 million

was posted by its insurer), and the individual surgeon was to post the remainder.[21]

On January 14, 2013, Williams filed an Application for Order to Appear and Answer

as to Assets, and Debtor was ordered to appear for an asset hearing on February 14, 2013.[22]

Also on January 14, 2013, Williams issued garnishment summonses on Aetna Life Insurance

Company, OK-HealthChoice, Proassurance Corporation (Debtor's insurer), Oklahoma

Health Care Authority, TRICARE, Oklahoma Surgical Hospital, LLC, Triad Bank, F&M

Bank, Saint Francis Hospital, and Blue Cross Blue Shield of Oklahoma.[23]  Triad Bank and

F&M Bank were both served with the garnishment summonses on January 15, 2013.  On that

date, Debtor's accounts at Triad Bank held $81,598.63 and its accounts at F&M Bank held

$27,580.75.  Because Debtor was denied access to funds totaling $109,179.38, it was forced

---

[18]Id. at 221.  See also Williams Exhibit 28 (documents demonstrating efforts to obtain supersedeas bond).

[19]Id.

[20]Order, Williams Exhibit 16.

[21]Order Setting Supersedeas Bond, Williams Exhibit 20.

[22]Williams Exhibits 17 and 18.

[23]Williams Exhibit 18 at 275; SAI Exhibit 2 at 32-38.

to borrow an additional $150,000.00 from Triad Bank to meet its immediate operating expenses. Although this new advance was secured by Debtor's assets, Triad Bank also required Debtor's members to personally guarantee repayment.  In addition, Debtor's anticipated income from patients' insurance benefits was interrupted by the garnishments.

On January 15, 2013, Debtor filed its Petition in Error, appealing the Judgment to the Oklahoma Supreme Court and asserting fifteen grounds for reversing the Judgment.[24] Debtor also filed an emergency motion to stay execution with the Oklahoma Supreme Court, which was denied.[25]

On January 17, 2013, Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code.  Five days later, Williams filed the Motion seeking dismissal of this case as having been filed in bad faith.

**Conclusions of law**

Section 1112(b)(1)

Section 1112(b)(1) of the Bankruptcy Code states, in relevant part –

Except as provided in paragraph (2) . . . , on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, **for cause** unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.[26]

---

[24]Williams Exhibit 19.

[25]Order, Williams Exhibit 21.

[26]11 U.S.C. § 1112(b) (emphasis added).

7

The movant has the burden of establishing cause for dismissal by a preponderance of the evidence.[27]  Lack of good faith in filing a Chapter 11 case is cause for dismissal under § 1112(b)(1).[28]  If a Chapter 11 case was filed for an improper purpose, that is, to unreasonably deter, hinder or harass creditors, rather than to achieve the legitimate objectives of Chapter 11—preserving a business as a going concern or maximizing the value of the estate for the benefit of creditors[29]—a court may conclude that it was filed in bad faith.[30]

Williams asserts that Debtor's Chapter 11 case should be dismissed as a bad faith filing pursuant to § 1112(b)(1) because (1) the bankruptcy arises out of a two-party dispute based solely on state law; (2) Debtor has very few creditors other than Williams; (3) Debtor is able to post a bond, but has chosen to file bankruptcy to avoid posting a bond to stay collection efforts pending appeal; (4) the sole purpose of the bankruptcy is to gain protection from a single judgment creditor; and (5) there is no possibility of reorganization.[31]

Recognizing that a few courts consider filing bankruptcy as a substitute for posting a supersedeas bond bad faith *per se,* this Court declines to adopt the *per se* approach and

---

[27]11 U.S.C. § 1112(b)(1); In re Hyatt, 479 B.R. 880, 886 (Bankr. D. N.M. 2012).

[28]See In re Muskogee Environmental Conservation Co., 236 B.R. 57, 66 (Bankr. N.D. Okla. 1999) (hereinafter "MECCO") and cases cited therein.

[29]See Bank of America Nat'l Trust and Sav. Assn v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 453 (1999) ("the two recognized policies underlying Chapter 11 [are] preserving going concerns and maximizing property available to satisfy creditors").

[30]See In re Marshall, 298 B.R. 670, 683 (Bankr. C.D. Cal. 2003) ("Marshall I"), *aff'd* 403 B.R. 668 (C.D. Cal. 2009).  See also In re Boynton, 184 B.R. 580, 581 (Bankr. S.D. Cal. 1995) ("a lack of good faith . . . is only present where the debtor's actions are a clear abuse of the bankruptcy process").

[31]Motion at 4.

instead considers whether the totality of circumstances supports a finding of bad faith.[32]

"Filing a chapter 11 case because of the crushing weight of a judgment is not unusual."[33]

However, an abuse of the bankruptcy process has been found where a judgment debtor has

the financial ability to post a bond, but chooses to thwart a judgment creditor's collection

action by filing bankruptcy instead.[34]   On the other hand, a debtor does not necessarily act

in bad faith by filing Chapter 11 where that debtor is faced with a large judgment and an

*inability* to bond a stay pending appeal; invoking the automatic stay to preserve a business

as a going concern is a legitimate use of the bankruptcy process.[35]   If execution by one

judgment creditor will put a debtor out of business, the debtor has a legitimate interest in

protecting the rights of other creditors, as well as its own right to continue in existence for

the sake of its employees and investors.[36]

---

[32]See collected cases in In re Marshall, 403 B.R. 668, 689-94 (C.D. Cal. 2009) ("Marshall II"); Hyatt, 479 B.R. at 893; MECCO, 236 B.R. at 67; In re Fox, 232 B.R. 229, 233-34 (Bankr. D. Kan. 1999); Boynton, 184 B.R. at 582.

[33]Marshall I, 298 B.R. at 683.

[34]See, e.g., Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828-29 (9th Cir. 1994) (debtor had resources sufficient to satisfy judgment or to obtain a supersedeas bond, and use of those resources would not have disrupted an ongoing business; debtor filed chapter 11 solely to deter and harass judgment creditor and therefore lacked good faith); MECCO, 236 B.R. at 67-68 (debtors had non-bankruptcy options where they had "both the ability to post the necessary *supersedeas* bond and to satisfy the State Court Judgment without losing their ability to operate the business"); Boynton, 184 B.R. at 582 (debtors who had sufficient means to post an appeal bond, and could not show that business operations or jobs would be jeopardized thereby, acted in bad faith by filing chapter 11).

[35]See Hyatt, 479 B.R. at 895-98; In re Ford, 74 B.R. 934 (Bankr. S.D. Ala. 1987); In re MV Pipeline Co., 2007 WL 1452591 (Bankr. E.D. Okla. 2007).

[36]One purpose of Chapter 11 is to "permit[] business debtors to reorganize and restructure their debts in order to revive the debtors' businesses and thereby preserve jobs

One consideration in determining this Motion, therefore, is "whether the debtor had the ability to post the bond without losing the ability to stay in business."[37]   Another consideration is "the timing of the filing and the Debtor's motive in filing [to] determine whether the Debtor intended to obtain the benefit of the automatic stay for an improper purpose."[38]   In addition, the Court may examine "local financial realities" to determine the good faith of the Debtor.[39]

In this case, Williams did not establish by a preponderance of the evidence that Debtor had the ability to post a supersedeas bond in the amount set by the District Court.  On the contrary, the weight of the evidence indicates that Debtor had insufficient assets to collateralize a $1.5 million *supersedeas* bond.  Debtor owns no real estate, had liquid assets of approximately $100,000.00, and had already pledged its receivables to Triad Bank. Historically, its operating expenses generally consumed almost all revenue on annual basis. Williams's bank garnishments forced Debtor to borrow an additional $150,000.00 to meet its immediate operating expenses, further impairing Debtor's financial condition.  With the $8.4 million judgment dwarfing the value of Debtor's assets, the "local financial reality" was that Debtor could not qualify for commercial financing to obtain a bond.

---

and protect investors."  Toibb v. Radloff, 501 U.S. 157, 163 (1991).

[37]Fox, 232 B.R. at 234.  See also Marshall I, 298 B.R. at 683-84.

[38]Fox, 232 B.R. at 235.

[39]Ford, 74 B.R. at 937, *quoting* In re Little Creek Development Co., 779 F. 2d 1068, 1072 (5th Cir. 1985).

With respect to timing of the filing, the Court finds that Debtor diligently attempted to *avoid* filing bankruptcy by various means.  Debtor voluntarily disclosed its financial condition to Williams and provided documentation thereof as evidence that it could not afford a bond in the statutory amount.  Debtor sought an order establishing a lower bond, sought a discretionary stay of execution, made diligent but unsuccessful efforts to obtain a bond, and moved for an emergency stay from the Oklahoma Supreme Court.  Debtor did not file for bankruptcy protection until it had exhausted all avenues for obtaining a stay pending appeal.  Williams's garnishment of Debtor's operating funds and receivables propelled Debtor, as a last resort, to file Chapter 11 to regain its ability to cover its operating expenses, retain its employees, and continue caring for its patients.  Any further collection activity would have put Debtor out of business.  Taking advantage of the automatic stay to preserve Debtor's surgical practice is not an abuse of the Bankruptcy Code, but rather is a legitimate use of the protections offered by the Code.[40]  The automatic stay provides Debtor "breathing room" to assess its options for restructuring or reorganizing as a going concern, or for liquidating in an orderly manner to maximize the return for all creditors.[41]

---

[40]"The bare fact that a debtor desires to obtain the benefits of the automatic stay cannot by itself support a finding of bad faith."  Fox, 232 B.R. at 235.

[41]In Marshall I, the court found the debtors' Chapter 11 filing immediately before a hearing to enforce a judgment reasonable because the judgment creditor "threatened to dissipate most or all of their assets.  Nothing in the timing of this case leads this court to conclude that the debtors had an improper purpose in filing this chapter 11 case."  Id., 298 B.R. at 683.  See also Ford, 74 B.R. at 938 ("There is little to be gained by allowing a forced liquidation . . . which this Court believes would result in chaotic dismemberment of the debtor's assets with resulting damage to the debtor, his co-owners and creditors alike.").

The Court further notes that Debtor's filing is not an attempt to attack the validity of Williams's Judgment, nor to move the venue of its dispute with Williams to this Court. The matter was fully litigated in state court, and the appeal will be decided by an Oklahoma appellate court.[42] Debtor is simply trying to survive as a going concern while an appeal of the Judgment is pending.

Williams also argues that because Debtor will not be able to propose a confirmable plan of reorganization, its Chapter 11 filing was in bad faith. First, it is too early to determine whether Debtor will be able to propose a confirmable plan. Debtor has not yet proposed a plan, and its exclusivity period does not expire for another two months. Williams's argument presupposes that Williams will object to *any* plan proposed by Debtor, which, because Williams is the largest unsecured creditor, would require Debtor under the absolute priority rule[43] to pay Williams the entire amount of the Judgment through the plan if Debtor's members intend to retain their interests. The Court declines to speculate on what type of plan Debtor might propose, and whether such plan will be acceptable to Williams or other creditors. The Court also declines to assume that Debtor and Williams will not be able to negotiate a consensual plan. If Williams does object to a plan of reorganization, Debtor

---

[42]Thus, this case is distinguishable from the MECCO case, wherein one side of a two-party state law dispute, dissatisfied with the state court process, desired to remain in Chapter 11, even though the judgment precipitating the filing was vacated and remanded, in order to relitigate the state law dispute in an alternate forum. MECCO, 236 B.R. at 66-68. The court found that because the debtors' Chapter 11 plan was proposed solely as a vehicle through which to litigate the validity of the state law claim, which could and should have been litigated in state court, the proposed plan served no legitimate bankruptcy purpose. Id. at 67-68.

[43]See 11 U.S.C. § 1129(a)(8) and (b)(2)(B).

may instead propose a plan for an orderly liquidation, an alternative with the bankruptcy purpose of maximizing the return to all creditors, which would not occur if Williams were allowed to proceed with the immediate liquidation of Debtor's assets through execution of the Judgment solely for their own benefit.

Finally, the Court takes into account the public interest in providing Debtor with a stay of execution of the Judgment.[44]   In absence of the protection conferred by the Bankruptcy Code, Debtor's surgical practice would be severely disrupted, if not dissolved, jeopardizing the health and lives of thousands of patients and the economic futures of 39 employees.  Debtor's representative testified that reconstituting a surgical practice following dissolution of Debtor would be an extensive time-consuming process, during which patients who needed surgeries would have to locate other surgeons, and patients who  needed post-surgery follow-up, including oncology patients, would likely not be able to obtain such care. In addition, with Debtor's surgeons performing in excess of 10,000 surgeries annually, even a temporary cessation of the surgical practice would likely produce administrative and economic chaos in the immediate medical community, affecting hospitals and other entities that provide ancillary services to Debtor's surgical patients.

Section 305(a)

Section 305(a) of the Bankruptcy Code provides that a court "may dismiss a case under this title . . . at any time if (1) the interests of creditors and the debtor would be better

---

[44]See In re 1701 Commerce, LLC, 477 B.R. 652, 659-60 (Bankr. N.D. Tex. 2012) (Even though the court found that debtor filed the chapter 11 case in bad faith, it declined to dismiss the case because "the public interest [would be] served by preserving value and jobs" and because the city had a significant interest in preventing foreclosure of the property, a first class hotel, that was deemed necessary to the area's economic development).

served by such dismissal . . . ."[45]  As discussed above, the Court does not believe that Debtor and creditors other than Williams would be better served by dismissal.  Moreover, at this time, the Court is not convinced that dismissal would be advantageous to Williams if it resulted in the eventual dismantlement of Debtor's surgical practice through piecemeal execution.  Providing Debtor an opportunity to propose a plan to pay Williams over time with revenue derived from its established surgical practice may prove more beneficial to Williams than allowing Williams to proceed with the available state law collection alternatives.

Accordingly, the Court concludes that dismissal under § 305(a) is not warranted.

**Conclusion**

For the reasons stated herein, the Motion is denied.

**SO ORDERED** this 21st day of March, 2013.

DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE

---

[45]11 U.S.C. § 305(a)(1).