Filed/Docketed
Jun 02, 2014

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **SURGICAL ASSOCIATES, INC.,** | ) | **Case No. 13-10081-R** |
| | ) | **Chapter 11** |
| **Debtor in Possession.** | ) | |

**ORDER GRANTING MOTION TO**
**ENFORCE SETTLEMENT WITH TRIAD BANK, N.A.**

Before the Court is the Motion of Debtor Surgical Associates, Inc. [the "Debtor"] to Enforce Settlement with Triad Bank, N.A. [the "Bank"] (Doc. 250) ("Motion to Enforce"). An evidentiary hearing was held on May 6, 2014, after which the Court took the matter under advisement. Upon consideration of the pleadings, the evidence admitted, arguments of counsel, and applicable law, the Court finds and concludes as follows:

**I. Jurisdiction**

This is a core proceeding as described by 28 U.S.C. § 157(a), (b)(2)(B), and (b)(2)(O). The Court has jurisdiction of this proceeding by virtue of 28 U.S.C. § 1334, Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma, and retention of jurisdiction provisions contained in the Debtor's Second Amended Plan of Reorganization Dated November 11, 2013, as modified (the "Plan"), and the order confirming the Plan. (Doc. 215).

**II. Findings of Fact**

Following confirmation of the Debtor's Plan, the Bank, an oversecured creditor, filed an application requesting allowance of post-petition attorney fees, costs and charges (collectively referred to as "fees" herein) as part of its allowed secured claim pursuant to

11 U.S.C. § 506(b).[1] Originally the Bank claimed it was entitled to recover fees in the amount of $31,877.50.[2] The Debtor disputed the reasonableness of the fees sought. The Debtor also objected to allowance of fees incurred prior to the petition date, contending that prepetition fees are not within the scope of § 506(b) and that such fees should have been included in the Bank's proof of claim.[3] At a hearing on the Application held on March 26, 2014, the Debtor also objected to allowance of fees incurred by the Bank for services related to the personal bankruptcy of Dr. Lockhart, one of the Debtor's shareholders. The Court also questioned whether all the requested fees sought fell within the scope of the loan agreements' provisions whereby the Debtor agreed to pay fees in connection with the *enforcement* of the agreements. In light of the number of unresolved legal and factual issues, the Court granted the Bank until Friday, April 25, 2014, to file a supplemental brief. The Court encouraged the parties to engage in good faith settlement discussions, however, to avoid incurring even more fees litigating the Bank's Application.

Attorney Robert Sartin and his firm, Barrow & Grimm, P.C., represented the Debtor for many years prior to the Debtor's bankruptcy as its outside general counsel. The Court authorized the Debtor to employ the firm as special counsel under § 327(e) to advise the Debtor during its bankruptcy with respect to matters of corporate, employment, health care

[1]Application of Triad Bank, N.A. for Allowance of Attorney Fees and Costs and Notice of Opportunity for Hearing ("Application") (Doc. 238). All code sections cited herein are sections of the Bankruptcy Code, *i.e.*, title 11 of the United States Code, unless otherwise specified.

[2]Application at 1, 5.

[3]Objection of Debtor to Application of Triad Bank, N.A. for Allowance of Attorney Fees and Notice of Opportunity for Hearing (Doc. 239).

and tax law, and with respect to claims by or against the Debtor, and to assist bankruptcy counsel in developing a plan of reorganization.[4] Soon after the March 26th hearing on the Bank's Application, Mr. Sartin advised the Bank, through one of its attorneys, Andrew Hartman, of the Debtor's offer to settle the dispute for $16,000.[5] Mr. Hartman rejected the $16,000 offer on the spot.[6] He advised Mr. Sartin that he believed that if the Bank prevailed in establishing that the requested fees were in fact within in the scope of the loan agreements' fee provisions, the Court would allow at least $18,000 plus fees incurred in preparing for and attending the March 26th hearing. Thus Mr. Hartman extended on behalf of the Bank an offer to settle for $20,000.

No further settlement discussions occurred until about 5:00 p.m. on Tuesday, April 22, 2014, when Mr. Sartin and Mr. Hartman spoke to each other by phone. They discussed

---

[4]Application for Order Authorizing Employment of Barrow & Grimm, P.C. as Special Counsel to the Debtor (Doc. 11); Order Granting Application to Employ Barrow & Grimm, P.C. as Special Counsel to the Debtor (Doc. 69). The Debtor retained the Hall Estill firm as its general bankruptcy counsel.

[5]Although the parties did not discuss when the compromised fees would be paid, the absence of an agreement on such a term is not relevant to contract formation in this instance. Within the context of a post-confirmation proceeding, resolution of a § 506(b) application simply requires the determination of an amount of fees allowable under § 506(b), and an order allowing such fees. Regardless of whether the number is determined by the Court or by the parties, the §506(b) allowance would simply be added to the Bank's secured claim. The terms of payment of the secured claim is governed by the confirmed plan. The parties *could have* agreed to other terms as part of a compromise, but in absence of any discussion of alternatives, the Plan already provided the manner of payment of the Bank's secured claim.

[6]Mr. Hartman testified that he and his firm had served as general counsel for the Bank for many years and that he had authority to make, accept and reject offers to settle matters on behalf of the Bank. Mr. Sartin testified that he did not have express authority to settle on behalf of the Debtor.

the fact that Mr. Hartman was working on the supplemental brief that was due on Friday, April 25, 2014, and Mr. Sartin again tendered the Debtor's $16,000 offer, and Mr. Hartman again countered with the Bank's $20,000 offer (the "April 22nd Offer"),[7] to which Mr. Sartin responded: "Surgical Associates will never pay $20,000."[8] Mr. Hartman understood that statement as a firm rejection of the April 22nd Offer by the Debtor.

Mr. Sartin relayed the April 22nd Offer to the Debtor, and on Wednesday, April 23, 2014, after consultation with Mr. Sartin and bankruptcy counsel Steve Soulé, the Debtor decided to accept the offer. Meanwhile, Mr. Hartman continued his research, and at 4:15 p.m. on April 23, 2014, he emailed Mr. Soulé and Mr. Sartin the citation of a case upon which the Bank would be relying to establish that its fees fell within the scope of the loan agreements' fee provisions (the "Amherst Case").[9] At 4:45 p.m., Mr. Sartin emailed the following to Mr. Hartman: "I talked to [the Debtor] and they will agree to pay $20,000. Do you want Steve [Soulé] to draft the order?"[10] At the time he sent the email accepting the April 22nd Offer, Mr. Sartin had not read the Amherst Case, and the Debtor's agreement to

[7]Mr. Hartman set no time limit for acceptance, or any other condition, on the $20,000 offer.

[8]Mr. Sartin testified that he probably would have said that he would discuss the offer with the Debtor and its bankruptcy counsel, because that would be his customary response, but he did not have any specific recollection of such a statement. Mr. Hartman testified that Mr. Sartin did not say anything about presenting the April 22nd Offer to the Debtor.

[9]Bank Exhibit 1 at page 5 of 9.

[10]Id. at page 4 of 9.

pay $20,000 was not in any way influenced by the email citing the Amherst Case. At 5:36 p.m., Mr. Hartman responded "I'll check with the Bank. We spent time today."[11]

On the morning of April 24, 2014, Mr. Hartman sent the following email to Mr. Sartin and Mr. Soulé:

> I spoke to [Bank president] Joe Hidy and gave him an overview of the [Amherst Case]. We may be wrong, but we believe that any risk of "no fee award" is now resolved. As you can see from the attachment, as of this morning, fees (after my recollection of Steve's proposed adjustments) are a little over $27K. Joe has authorized me to settle for $24K on the condition that the order specifically provides that the agreed order is without prejudice to our right to request reasonable fees and services from and after April 25, 2014. Jack [Moore] will be finishing the brief this afternoon and that will include more time, so please let me know ASAP.[12]

Mr. Sartin, believing that the Debtor's April 23rd acceptance of the April 22nd Offer terminated the Bank's right to revoke the offer, stated in a return email that he was "shocked that after I accepted the offer yesterday that your client decided that it will no longer honor the offer."[13] In response, Mr. Hartman explained that "I offered to settle for $20K before the research was done. You did not accept that offer and your offer was $16K before we did our research. After I sent you the research, you offered $20K. I told you I would check with the Bank. Please don't mischaracterize things."[14]

---

[11]Id.

[12]Id. at page 2 of 9.

[13]Id. at page 1 of 9.

[14]Id.

The Bank filed its supplemental brief on April 25, 2014.[15] In it, the Bank acknowledged that prepetition fees were not recoverable under § 506(b), that fees incurred in connection with Dr. Lockhart's case could not be allowed, and that a duplicate time entry should be deleted; these adjustments reduced the amount of fees originally requested by $9,315.00.[16] However, the Bank added $7,020.00 for services rendered *after* the Application was filed, resulting in a renewed request for allowance of $29,582.50.[17]

Later on April 25, 2014, the Debtor filed its Motion to Enforce, requesting the Court to find that the Bank "made a valid, binding offer to settle the pending objection to the Triad Fee Application that was accepted by the Debtor" and to order the Bank "to abide by that settlement."[18]

## III. Conclusions of Law

"'A trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it.'"[19] "Issues involving the formation and construction of a purported settlement agreement are resolved by applying state contract

---

[15]Memorandum of Law in Support of Triad Bank's Application for Allowance of Attorney Fees and Costs ("Memorandum")(Doc. 249).

[16]Id. at 2.

[17]Id. at 14 and Affidavit of Andrew S. Hartman, attached to the Memorandum.

[18]Motion to Enforce at 3.

[19]Shoels v. Klebold, 375 F.3d 1054, 1060 (10th Cir. 2004) (*quoting* United States v. Hardage, 982 F.2d 1491, 1496 (10th Cir. 1993)).

law."[20] "[T]he rules of offer and acceptance and of mutual assent . . . control any issue of contract formation."[21] Under Oklahoma law,

> The law and public policy favor settlements and compromises, entered into fairly and in good faith between competent persons, as a discouragement to litigation and such agreements are generally enforced absent fraud, duress, undue influence, or mistake. A contract is an agreement to do or not to do a certain thing. A settlement agreement is a contract which constitutes a compromise between two or more parties to avoid a lawsuit and amicably to settle their differences on such terms as they can agree. A contract includes not only the promises set forth in express words, but all such implied provisions as are indispensable to effectuate the intent of the parties and as arise from the language of the contract and the circumstances under which it was made.[22]

Settlement agreements are enforceable even if not committed to writing.[23] The issue here is whether the various conversations between the parties' representatives (by phone and email) resulted in the mutual consent of the parties to allow fees in the amount of $20,000 in settlement of the Bank's § 506(b) Application and the Debtor's objection thereto.

That the Bank made the April 22nd Offer is undisputed.[24] The Bank contends that the Debtor instantly rejected the offer during the phone conversation between Mr. Sartin and Mr. Hartman, thus terminating the Debtor's power of acceptance. The Debtor contends that Mr.

---

[20] Id. (citation omitted).

[21] In re De-Annexation of Certain Real Property from City of Seminole, 2009 OK 18, 204 P.3d 87, 89.

[22] Whitehorse v. Johnson, 2007 OK 11, 156 P.3d 41, 46 (footnotes and citations omitted).

[23] See Russell v. Bd. of County Comm'rs of Carter County, 2000 OK CIV APP 21, 1 P.3d 442, 443. See also In re De-Annexation, 204 P.3d at 89.

[24] Mr. Hartman admitted that the Bank was willing to settle the matter on April 22nd for $20,000, and that he had authority to bind the Bank in making the offer.

Sartin had no authority to reject the offer, that Mr. Sartin's statement was a negotiating tactic that could not reasonably be construed to constitute a rejection, and that the Debtor timely and unambiguously accepted the April 22nd Offer, thus terminating the Bank's power to revoke the offer. Determining the legal significance of the parties' words and conduct is an issue of law,[25] and the central issue here is whether the Debtor immediately rejected the April 22nd Offer by virtue of Mr. Sartin's statement that the Debtor "will never pay $20,000." While Oklahoma caselaw and statutes provide some guidance for resolving disputes concerning contract formation, none is directly on point. However Oklahoma contract law generally follows the black letter law refined in the Restatement (Second) of Contracts.[26]

Restatement (Second) of Contracts § 38, entitled "Rejection," provides –

> (1) An offeree's power of acceptance is terminated by his rejection of the offer, unless the offeror has manifested a contrary intention.
>
> (2) A manifestation of intention not to accept an offer is a rejection unless the offeree manifests an intention to take it under further advisement.[27]

While Mr. Sartin did not intend to reject the offer on behalf of the Debtor (as he had no authority to do so), the Bank (through Mr. Hartman) interpreted Mr. Sartin's statement as a clear manifestation of the Debtor's intention not to accept the April 22nd Offer. In light of

---

[25] See In re De-Annexation, 204 P.3d at 89 (when a dispute as to whether a settlement agreement has been formed "concerns the legal effect of the relevant facts, the question is whether the party seeking enforcement is entitled to judgment as a matter of law").

[26] See, e.g., Hardin v. First Cash Fin. Servs., Inc., 465 F.3d 470, 477-78 (10th Cir. 2006) (in a dispute governed by Oklahoma law, the court applied "classic contract principles" of offer, acceptance, counteroffer and rejection as explained in the Restatement to resolve the issue of contract formation).

[27] Restatement (Second) of Contracts § 38 (1981).

the Bank's misunderstanding of Mr. Sartin's intent, the question becomes whether the Bank's interpretation was justified. Comment b to § 38 states, in part–

> Where the manifestation of intention of either party is misunderstood by the other, the principles underlying § 20 apply. If the offeror is *justified* in inferring from the words or conduct of the offeree, interpreted in the light of the offeror's prior words or conduct, that the offeree intends not to accept the offer and not to take it under further advisement, the power of acceptance is terminated.[28]

Section 20 of the Restatement (Second) of Contracts, entitled "Effect of Misunderstanding," provides, in general, that if "parties attach materially different meanings to their manifestations," and neither party knows or has reason to know the meaning attached by the other, neither party's meaning will prevail, and no consequences will flow from the exchange.[29] However, "[t]he manifestations of the parties are operative in accordance with the meaning attached to them by *one of the parties*" where the other party knows or "has reason to know the meaning attached [to the manifestation] by the first party."[30] This principle governs whether Mr. Hartman was justified in inferring that Mr. Sartin's statement that the Debtor will never pay $20,000 constituted a rejection and terminated the offer. If Mr. Hartman had "reason to know" that Mr. Sartin did not have the authority to reject a settlement offer, then Mr. Sartin's understanding of his words–as negotiating tactics intended to elicit a better offer, rather than as the verbal act of rejection–must prevail.

---

[28]Id. § 38 cmt. b (emphasis added).

[29]Id. § 20(1).

[30]Id. § 20(2)(b) (emphasis added).

Section 20 of the Restatement (Second) of Contracts in turn refers to Comment b of § 19 for the meaning of "reason to know," which provides as follows–

> A person has reason to know a fact, present or future, if he has information from which a person of ordinary intelligence would infer that the fact in question does or will exist. A person of superior intelligence has reason to know a fact if he has information from which a person of his intelligence would draw the inference. There is also reason to know if the inference would be that there is such a substantial chance of the existence of the fact that, if exercising reasonable care with reference to the matter in question, the person would predicate his action upon the assumption of its possible existence.
>
> Reason to know is to be distinguished from knowledge and from "should know." Knowledge means conscious belief in the truth of a fact; reason to know need not be conscious. "Should know" imports a duty to others to ascertain facts; the words "reason to know" are used both where the actor has a duty to another and where he would not be acting adequately in the protection of his own interests were he not acting with reference to the facts which he has reason to know. See Restatement, Second, Agency § 9; Restatement, Second, Torts § 12; Uniform Commercial Code § 1-201(25).[31]

In this situation, the Court concludes that Mr. Hartman, as an attorney, had reason to know that Mr. Sartin, as special counsel to the Debtor, lacked the authority to reject a settlement offer concerning a pre-confirmation claim against the Debtor's estate without first presenting the offer to the Debtor. Decisions as to *whether* and on what terms to settle a claim are reserved to the client and are outside the *presumptive authority* of a lawyer to act on behalf of a client.[32] Under rules of professional conduct, absent a client's express

---

[31]Restatement (Second) of Contracts § 19 cmt. b.

[32]See Restatement (Third) of the Law Governing Lawyers § 22(1) ("Authority Reserved to a Client") and cmt. a. See also Makins v. District of Columbia, 861 A.2d 590, 595 (D.C. 2004) (en banc) (a "client's right to accept or reject a settlement offer is absolute"), *quoting* In re Hager, 812 A.2d 904, 919 (D.C. 2002).

instructions otherwise, an attorney must present all settlement offers to its client.[33] These well-known rules of professional conduct "*inform* the reasonable beliefs of any opposing party involved in litigation . . . , as well the reasonable beliefs of the opposing party's counsel, whose practice is itself subject to those ethical constraints."[34]

To the extent that the Bank relies upon the doctrine of *apparent authority* to justify reliance upon Mr. Sartin's purported summary rejection of the April 22nd Offer, the burden was on the Bank to establish that the Debtor led the Bank to believe Mr. Sartin had such

---

[33] See Oklahoma Rules of Professional Conduct 1.2 ("[a] lawyer shall abide by a client's decision whether to settle a matter") and 1.4 ("A lawyer shall (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent . . . is required by these Rules."). The Comment to Rule 1.4(a)(1) states:

> If these Rules require that a particular decision about the representation be made by the client, paragraph (a)(1) requires that the lawyer promptly consult with and secure the client's consent prior to taking action unless prior discussions with the client have resolved what action the client wants the lawyer to take. For example, a lawyer who receives from opposing counsel an offer of settlement in a civil controversy or a proffered plea bargain in a criminal case must promptly inform the client of its substance unless the client has previously indicated that the proposal will be acceptable or unacceptable or has authorized the lawyer to accept or to reject the offer.

Id. See also Hays v. Monticello Retirement Estates, LLC, 2008 OK CIV APP 74, 192 P.3d 1279, 1282 ("the power to settle or compromise lawsuits is not usually contained within the scope of an attorney's employment, and third parties would not be justified in believing that an attorney had such authority merely by virtue of his or her representation"); Restatement (Third) of the Law Governing Lawyers § 20(3) ("A must notify a client of decisions to be made by the client . . . and must explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation").

[34] Makins, 861 A.2d at 595 (emphasis original) (citation omitted) (referring to the rules of professional conduct adopted by the District of Columbia, which are substantially similar to Oklahoma's rules).

authority.[35] "The apparent authority of an agent arises when a principal places the agent in such a position as to mislead third persons into believing that the agent is clothed with the authority which in fact he does not possess."[36] "The third party's perception may be based upon 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on [its] behalf by the person purporting to act for [it].'"[37] Because the Bank presented no evidence of any words or conduct *of the Debtor* that led Mr. Hartman to believe that Mr. Sartin possessed authority to accept or reject settlement offers, the Court finds that Mr. Hartman was not justified in interpreting Mr. Sartin's comment as the Debtor's unequivocal rejection of the April 22nd Offer.

In any event, the statement Mr. Hartman interpreted as a rejection could easily be interpreted as an expression of Mr. Sartin's opinion of the Debtor's resolve for negotiating purposes, rather than a transmission of the Debtor's authorized response to the April 22nd

---

[35] Id. at 594 ("Whether an agent had apparent authority is a question of fact and the party asserting the existence of apparent authority must prove it") (citation omitted).

[36] Id. (citation omitted).

[37] Id., *quoting* Restatement (Second) of Agency § 27 (1958). See also Hays, 192 P.3d at 1282 ("the apparent power of an agent must be determined by the acts of the principal, and not by the acts of the agent"). See also Restatement (Third) of the Law of Lawyers § 27 cmt. d (a lawyer lacks apparent authority to perform acts reserved to a client (*i.e.*, deciding whether and on what terms to settle), a fact that the opposing party and counsel should know, unless the client has manifested an indication to the contrary; for example, where during a court hearing with all parties and lawyers present, the court orders that someone with settlement authority, either the client or its lawyer, appear at a pretrial settlement conference, and the client leaves as the conference begins without further comment, the client's act creates apparent authority in the lawyer to enter a settlement agreement on behalf of the client).

Offer. A policy allowing a lawyer's aggressive negotiating strategy (*i.e.*, denigrating an offer as outrageous or unacceptable) to be interpreted as a rejection of a settlement offer *by the client* would undermine the settlement process and sow uncertainty as to what words or conduct would be construed as zealous negotiation and what would constitute verbal acts with legal consequences.[38]

The Bank also argues that no contract was formed because the parties had not negotiated all necessary terms, such as time and manner of payment, or the time frame covered by the settlement. As stated above,"a contract includes not only the promises set forth in express words, but all such implied provisions as are indispensable to effectuate the intent of the parties and as arise from the language of the contract and the circumstances under which it was made."[39] Under the circumstances here, payment terms are provided by the Plan, and based upon the testimony and circumstances, the Court finds the April 22nd Offer was intended to compromise all fees requested in the §506(b) Application and all fees incurred in litigating the Application. When the Debtor accepted the offer on April 23rd, the dispute as to the amount of fees that would be allowed under § 506(b) was settled, and any further action by the Bank in pursuit of allowance of fees was unwarranted. Thus, the Court finds that fees incurred in connection with this dispute after the April 22nd Offer were not reasonably incurred. The Debtor's acceptance of the April 22nd Offer as a final resolution

---

[38] See Guzman v. Visalia Community Bank, 84 Cal. Rptr. 2d 581, 584 (Cal. Ct. App. 1999) (a lawyer's characterization of opposing party's settlement offer as "insulting and demeaning" did not constitute rejection of the offer).

[39] Whitehorse v. Johnson, 2007 OK 11, 156 P.3d 41, 46 (footnotes and citations omitted). See also 15 O.S. § 172.

of the final outstanding matter in its Chapter 11 case terminated any justification for assessing any more fees against the Debtor related to this dispute.[40]

Accordingly, the Court finds and concludes that the Debtor's Motion to Enforce should be granted and that the Bank's fees should be allowed under § 506(b) in the amount of $20,000.[41]

**SO ORDERED** this 2nd day of June, 2014.

DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE

[40]To be clear, however, the settlement–and this Court's allowance of the Bank's § 506(b) claim in the amount of $20,000–does not preclude the Bank from recovering fees incurred in the future for matters unrelated to this § 506(b) dispute to the extent such fees are permitted by the loan agreements incorporated in the Plan.

[41]The Court notes that the Bank has now acknowledged that its original fee request contained time entries for fees not allowable under § 506(b), including prepetition fees, fees incurred in connection with Dr. Lockhart's personal bankruptcy, and duplicate fees, totaling in excess of $9,000. Had those fees not been included in the original Application, the Debtor may not have been compelled to object to the Application, and neither the Bank nor the Debtor would have incurred fees litigating the § 506(b) matter. In light of these circumstances, the Court finds and concludes that allowing fees in the amount of $20,000 is fair and reasonable.